All right, thank you. You can be seated. For the benefit of the students who probably wonder what's going on, we have a tradition in this court, after arguments, to go down and speak to the counsel and say hello to them. A lot of the lawyers who argue in here are friends of ours or perhaps former clerks, as one of them was, who used to work up here. So it's just a chance for us to come down and speak to them and say hello and catch up briefly. It's just a tradition that's unusual and unique to this court. And on occasion, we'll single out an A student in the audience and shake that hand, too. All right. Ms. Calderon, did I say that right or close enough? You know who I was talking about. Ed, we'll be glad to hear from you. Good morning, Your Honors. Good morning. Your Honors, may it please the Court, my name is Ofelia Calderon, and I represent the petitioner Leopold Munyakazi on this case. This court should grant Mr. Munyakazi's petition for review because the decision of the IJ and the Board of Immigration's appeals below was not supported by substantial evidence. The IJ and the BIA erred as a matter of law when their findings and their conclusions were based on speculation, conjecture, and presumptions that were not reasonably grounded in the record. The record here is expansive, unusually so because the petitioner in this case presented nine live witnesses over two proceedings who were available for cross-examination and voluminous documentation of country conditions, his own experience in Rwanda, and everything that supported his own application for asylum, withholding of removal, and protection under the Convention Against Torture. Because of that record and this evidence, the record compels reversal on both of his applications, the application for asylum and for protection under CAT. On two points, the parties agree here. No one disputes that if Mr. Munyakazi is returned to Rwanda, that he will be detained by the Rwandan government. Furthermore, in the 2010 proceeding, the immigration judge also determined that he does have a fear of persecution based on his political opinion, specifically referencing two speeches that he gave here in the United States in 2006 at the University of Delaware and then at Montclair State University, where he characterized the terrible events that happened in Rwanda as a fratricide rather than a straight-up genocide. Is he sorry he made those speeches? I'm sure he is, Your Honor. I'm kind of wondering, in the facts of it, I guess he's a prominent person and he felt like he could do what he wanted to do, I guess, but did that raise his profile? I'm not sure that he felt that he wanted to do what he wanted to do. I don't mean that in any derogatory way. I just mean he was a person of some importance and he wanted to talk about what happened, so he goes and talks about it. But it looks to me like, boy, that raised his profile. I believe, actually, that even prior to that, it did raise the profile. You're right, Your Honor, actually. It did in the sense that his statements are in direct contradiction with the narrative that really provides the premise for the current Rwandan regime, and so that was a problem. No doubt, even prior to those speeches, his other political activities in opposition to the current regime led to the persecution for which he originally applied for asylum in 2004. Why do you think we're compelled to find a contrary decision? That's a fairly high standard, you agree. I agree. It's a very high standard. I agree. I agree it is a very high standard, and the reason I believe that is because all of the evidence points to opposite conclusions. Today, I actually wanted to start with Kat, with the convention, and the reason why I wanted to do that is because I think that it highlights the unreasonableness of the tribunal below. If we look at Kat, the applicant has to demonstrate that it is more likely than not, excuse me, that he will be tortured upon his return. According to 8 CFR 1260, 1208.16C3, the fact finder has to look at the possibility of relocation, evidence of past persecution, as well as current conditions in the country itself. Well, relocation is not an issue. We know Mr. Mwenukazi is going to be detained. That fact's not in dispute. We also know that he suffered past persecution because he was detained for four and a half years in a Rwandan jail. That fact's not in dispute. While he was there, he was beaten. He was subject to repeated beatings, actually. Guards walked on his back, and burning nails were pressed into his skin. So we know that he was subject to past persecution. With respect to current conditions, voluminous evidence was submitted at both times, at both hearings, that human rights violations are rampant in Rwanda. There were experts who talked about it. There was a specific witness at the 2013 hearing who had just arrived from Rwanda, was an asylee, and he described being taken into custody, not only at a military facility, but also at police facility, regular police facility. He was subjected to repeated beatings. He was beaten. But wasn't there testimony from another witness that he did not see any torture at the civilian facility? Wasn't there testimony of that? He testified that he saw ill treatment, and that was not expanded upon at that time. And perhaps it should have been, and perhaps that is a failing of myself for not expanding upon that. But you have to base it on what's in front of the decision-maker below. Well, for certain, he testified that he himself was tortured in several facilities, military and civilian both. For sure, and for certain, the record, the Department of State reported on instances of torture. Amnesty International also reported that there were various locations and that they believe that the instances of tortures were underreported. The Human Rights Watch also did the same. But that compels a conclusion that he'd be tortured in a civilian facility? I believe that it . . . You might think the greater way the evidence gets you there, but you think that compels that conclusion? I think that no reasonable fact-finder could find that based on those conditions, on the conditions as they exist in Rwanda, with the knowledge that you know he will be taken into custody, that it is no reasonable fact-finder could find that it's not more likely than not that he will be tortured. Well, are you saying that past torture is dispositive of the likelihood of future torture? Absolutely not. I'm saying that in combination, his past torture combined with current conditions, combined with the testimony of live witnesses, in particular someone who was subjected to torture, who was not a military terrorist either. He was just someone who was in the opposite political . . . who was opposed to the current political regime, just like Mr. Munyakazi. He was tortured. He was placed in a hole where they funneled car exhaust smoke down there to receive confessions. There were many reports, actually, that the police tortured individuals in the beginning parts of their arrest to obtain false confessions. So I think when you combine all of that evidence, the answer is yes. I do believe that the evidence compels this tribunal to overturn, to reverse the denial of Kat. The reason I wanted to start with Kat, actually, is because I think that it highlights the unreasonable nature of the entire proceeding. It also highlights taking the Kat and thinking about how that evidence was looked at and then placing the asylum case in that backdrop. I also believe that the evidence compels a reversal on the asylum. The immigration judge below found that Mr. . . . notwithstanding the fact that she found that he was subject to a fear . . . that he had a fear of persecution based on his political opinion, she further found that he was ineligible for it because of the human rights persecutor bar. Same thing. There was voluminous evidence to the contrary. The standard, such as it is, is that the government shows evidence that may indicate that the individual was involved in persecution. And then the burden sort of shifts to the applicant. And then the applicant shows by preponderance of the evidence. All of the evidence that was submitted, again voluminous, demonstrated beyond the preponderance standard that Mr. . . . was not involved in the genocide. He testified credibly. His wife testified credibly. He . . . at the first hearing in 2010, there were two witnesses, a Mr. Ghassani and a Mr. Rawake, both Rwandans, both who had previously been involved with the government at some level, one that was involved with an opposing party, one that was actually the ambassador from Rwanda to the UN. Both testified that they had known Mr. Rawake for many years, Mr. Ghassani since 1984, and that it was simply inconsistent with all of Mr. Munyakazi's history, with his political affiliations, with his work with the human rights organizations in Rwanda, that he would be involved in this genocide. Another point that is not in dispute is that Mr. Munyakazi for many, many years has been an opponent of the government. And as a result of that, these are the exact reasons why the Rwandan government has raised these trumped-up charges against Mr. Munyakazi. And the problem with that, I think, is that as Mr. . . . Ramsey Clark, former Attorney General of the United States, who had done his own work in Rwanda with the International Criminal Tribunal. He was also a defense counsel there. He testified that in his work, over and over again, he saw evidence of the Rwandan government manipulating evidence, manipulating witnesses, and using their power abusively. The same thing was said by Peter Erlander, who was the lead defense counsel at the ICTR for six years. His testimony is particularly interesting because he testified that throughout all that time, when he was defending the so-called Category 1 defendants, he never saw Mr. Munyakazi's name. Mr. Munyakazi's name had never came up. Well, this is completely contradictory to the current narrative of the Rwandan government, where they're saying that Mr. Munyakazi was some sort of a leader of this genocide. Well, don't you think that if that was the case, that his name would have come up previously? Not necessarily. That sounds like a typical criminal prosecution, where there are people who will get up and say, I was in that conspiracy, and I never knew him. In fact, they'll go beyond that. I knew him, and I can say he's not the kind of guy that would ever be involved. So I don't think that's that unbelievable that you get somebody to say that. I think what you have to consider maybe more strongly is, didn't Mr. Hyman, the investigator, say he was inclined to believe your client, and then after his investigation he no longer believed him? Well, Agent Hyman never met my client. I didn't say that. I said, didn't he indicate that he was sympathetic to your client in his version of the facts? Because he thought he was an intellectual, and he seemed like a moderate person for what he knew about him. But once he did his investigation, he no longer believed that. He thought he was involved. Well, I would agree that Agent Hyman did say that. I mean, he did say that. He said that that's how he went into it. I just think it's important to note that he did not know Mr. Munyakazi. I mean, he went into this investigation, and when he went there, I mean, as we have argued, I don't believe that the investigation is untainted. Do you dispute that Mr. Hyman knew more about your client than did Ramsey Clark? I can't. Didn't Hyman go there specifically to involve the involvement of your client in these genocides? Didn't he go there to investigate that? He did, absolutely. He specifically went to. He came back and said, in his opinion as an investigator, that your client was involved in this. He did say that. But I think it's important to note that Agent Hyman, that the entire investigation was tainted by the Rwandan regime. I don't think that there's any question about that. Actually, Hyman, didn't Hyman talk about that? He said he tried to keep the government from finding out who he wanted to talk to until as late as possible. I thought he said he actually talked to some witness that had not been talked to by the authorities. Did he not say that? Well, what he said exactly was that he said everything up to the last portion. But the fact of the matter is that Agent Hyman and his group, they were hosted by the Rwandan government, that they received information from the Rwandan government, that the Rwandan special prosecutor was present at every single location of every single witness. He may not have been in the room at the time of the interview, but he was present at all times. He took them to the village, a small village, a small agrarian village, as described by Special Agent Hyman. You don't think the immigration judge could take that into account? I think she failed to in this particular case. And I think that, again, that it's— But she didn't know it or she just didn't want to take that into account? I'm not sure that I can guesstimate on that portion. She didn't take it into account, and she gave a basis for what she did. I mean, you're making a nice argument for your client, but that's a very high standard. I agree it's a high standard, Your Honor. And I know you think you've met it, but it has to be— we have to believe that any reasonable person would be compelled to believe not only the testimony that you say occurred, but any inference from that testimony that you find helps your case, basically. I agree. Do we have to discount the entirety of the DHS investigation to find a real client? No, actually you don't. I think what you have to do is—I think that the answer is that the question is, does Mr.— I think the real question is, did Mr. Munyakazi demonstrate beyond a preponderance of the evidence that he wasn't involved? And I think that Mr. Munyakazi—I think that we did that. We did that. Because, in contrast, when we think about the number of witnesses—and, again, you know, the fact of the matter is that there were nine live witnesses, and they were all available for cross-examination. When we look at the witnesses, at the witness testimony, which is double, triple, hearsay in this particular case, which I understand, and I'm sure that Your Honors understand, is permitted in immigration court, okay, what is their testimony, and how does it stand up against the evidence that was presented by Mr. Munyakazi? Your Honor brought up the one convicted genocidaire. Well, I mean, the fact of the matter is that he still is a convicted genocidaire, and different from here in the United States, it is documented that in Rwanda you receive benefits from rolling on people all the time. In fact, all of the reports, Amnesty International— So you don't think that's documented here? I think that it is incredibly documented in Rwanda, and I would like to think that there is— I'm sure. —clear agreements, and, you know, it's always met. Of course that's absolutely true, but we're not a dictatorship, and we also have a justice system that we can be proud of, and this is not the case for Rwanda, and that's something to keep in mind here at all times, that the backdrop of this case is against a regime. Yeah, but wait, but wait, but the determination made was made in our judicial system. It is— We're proud of. Yes, but based on witnesses that were—based on testimony that was obtained— I understand you have the right to argue against a decision that you think is not correct, even in a fair judicial system. You're still allowed to argue against it because that's part of what you think makes it fair. Well, I do think that, and I also think that it's important that we look at the weight, I mean, that we look at the weight, because the truth is is that a reasonable fact finder is going to weigh that. Make your two or three—and I'm going to have the other side respond. Tell me the two strongest points or three, if you have time, why you win. Why is—why does this evidence, this evidence, this evidence mean you must win even under this difficult standard? Okay, well, on the cat, I 100 percent believe that all of the evidence compels only one conclusion. I think that all of the documentary evidence says that torture is more likely than not to occur, and trying to separate the two points between civilian and military doesn't work, because the witness that we had said, the military is the police, the police is the military, and who would know better? But you think he's clear under the testimony he's going to be tortured if he goes to jail? Yes, that's correct. Okay. Number two, I believe that for purposes of asylum and the human rights persecutor bar, Mr. Muneokazi has demonstrated beyond a preponderance of the evidence, which is our standard, and if we're arguing about standards, it is not beyond a reasonable doubt. It is beyond a preponderance of the evidence that he was not involved in this genocide. That's based on what now? That's based on his evidence in comparison with their evidence. But you understand now, that's not the normal standard, that we just weigh who caused the most witnesses. Of course. We need to make it credible. Of course, but his witnesses are credible, consistent, and consistent not only with their own testimony in the moment, but consistent with the history of Mr. Muneokazi over the last 25 years. That's important. The witnesses of the government, in contrast, are not. Of the six that the immigration judge chose to accept, one of them didn't even have personal knowledge. One of them claimed that she had heard it from an unknown source at an unknown place at an unknown time, and this is the exact type of information that was accepted as compelling by Agent Hyman. That underscores the complete failure of this investigation, the fact that he wasn't looking at any of these things, that he didn't ask these genociders. Again, we understand she didn't accept that. But like I said, the failure of the investigation highlights why that evidence, why our evidence, compels this reversal. I'll come back. Thank you. Good morning, Your Honors. Jeffrey L. Mencken, United States Department of Justice for the Attorney General. May it please the Court. The petitioner at all times bore the burden of proving that he was eligible for relief from removal. Mr. Muneokazi's attorney started with the cat, and so I can address that first as well. There is no evidence that would compel reversal of the board and the immigration judge's finding that he did not meet his burden of proof that he is more likely than not to be tortured. And the reason is, it's not that he's going to be taken into custody if he returns to Rwanda. It's that he's going to be taken into custody and sent to a place where he is more likely than not to be tortured. And the evidence cited by the board and the immigration judge all found that people accused of genocide and genocide negation are not sent to military facilities but are sent into the civilian facilities. And there's no evidence on this record of torture in the civilian facilities. And it's a very important distinction because it really turns on that. The board found that under certain circumstances, it's possible or conceivable that treatment in military facilities could be considered torture, but that is not what we have here. It's like saying if he was sent to Canada, he would be in a great deal of trouble, but all the evidence shows that he's going to Spain. It's as wide a difference as that, and certainly under the burden of proof here, the petitioner cannot prevail. And that's where you all really disagree, because she says they're one and the same for all practical purposes. That's fine. That's argument. But let's separate the argument from the record. You have Mr. Bhavanposi who did testify, and he said that when he was in a military facility, he saw no one who was charged with genocide. When he was transferred to a civilian facility, he did see people charged with genocide, and he, in fact, was aware of people who had been charged with genocide who were then acquitted. So the charges that have been lodged against this petitioner are not the kind, based on this record, that are more likely than not to put him in a position where he is. Do you think that evidence alone is sufficient that other evidence could be dismissed? Well, I haven't heard any other evidence. I've heard evidence that in military facilities things happen. The finding of the agency, both the immigration judge and the board, is he is more likely than not to be tried within a civilian facility. The Gakaka courts that were talked about in the proceedings below were split into two. The Gakaka courts, the local courts where all sorts of mischief apparently took place, stopped functioning in June of 2012. So all of the evidence identified by the agency in support of its decision makes that very, very important distinction, and we cannot leap that chasm here. There is no evidence that compels reversal of the findings of the agency on that very important point. There are other examples. There was a U.N. tribunal transferred, and the board cited this, the case of Gene Yuenkindy, who was charged with genocide, and they transferred that case to the Rwandan civilian courts based on findings that they did meet international standards, and there's been no evidence that this person has been tortured. In fact, I believe I could be confusing him, but I believe his only complaint was there was no room in his cell to put his books. But be that as it may, the evidence that applies to this petitioner is there, and there's no evidence that compels a contrary finding on the pivotal key point made by the agency. Now, as far as the asylum eligibility, the evidence most certainly indicated, as the regulation states, that the petitioner may have been involved in genocide. The DHS sent three agents to Rwanda to conduct a three-week investigation. They interviewed 22 witnesses, of which the immigration judge credited seven, six civilians, some of whom were victims, and one perpetrator, convicted perpetrator, who had not been identified to DHS by the Rwandan government. In fact, four of the witnesses, including that one perpetrator, were not identified to the Rwandan government by that perpetrator. The witnesses that counsel talked about, her witnesses, that talked about how Rwandans conduct investigations, is fine. But this was not a Rwandan investigation. This was a United States government investigation conducted by the Department of Homeland Security, who sent three agents. You're not likely to see that thorough an investigation in many of these cases. Of these- I thought she said Rwandan authorities were present during the interviews, and of every- No- Or nearby. I thought that's what she said. The ground rules that were set up was the agents needed assistance to physically locate some of these witnesses and to go there. That is not unusual at all. I didn't say there was anything necessarily wrong with it. I'm just saying what she said to discount the testimony was that fact, that these people were under the thumb of or likely to be held responsible by the Rwandan government if they didn't say what the Rwandan government wanted. I take that to be the import of what she was saying. The factual finding below was that the agents took steps, took measures to secure the independence of their investigation. We cannot find that evidence compels the reversal based on the idea that, well, the government hasn't proven that no one was coerced because there's no evidence to the contrary. There was no witness who was interviewed by DHS who expressed fear of the Rwandan government. In fact, quite the contrary. There were witnesses who expressed fear of the petitioner and petitioner's family and revenge from people affiliated with the petitioner. There was evidence of attempted bribery to make sure that nobody said anything in this case. At every step of the way, the burden was on the petitioner, and here more so than anywhere else along the trail. And the board rejected the premise that the Rwandan government controlled this investigation. It's pure argument to say otherwise. There was even argument below that the agent was stupefied because the Rwandans drove him around in a fancy car, and that took away his objectivity, and that's just unfounded. So there's no evidence that the Rwandan government in any way interfered with this investigation. What's your strongest evidence that he did participate in genocide? Of the seven witnesses credited by the immigration judge, at least three, the one, the convicted perpetrator who had not been identified by the Rwandans, had the petitioner at that meeting on April 19, 1994, directing orders to the crowd to go out and kill. There is a witness, and I can give you the name, who another witness, a civilian, initials AG, heard the petitioner give those orders, those same orders. Witness SN said men came to her house and said the petitioner had told them to find the Tutsis, and they didn't take at least one of the children because the father was an ethnic Hutu. There was a witness whose name was completely blanked out who also saw the petitioner at that meeting that set off the genocide. Other witnesses heard other evidence. It was a small village. I think everybody knew what was going on. So that evidence absolutely indicated. Did the nephew indicate that the petitioner was at the soccer field wearing banana leaves? Yes, yes. What weight do you put on that, I'm asking, or did they put on that? The immigration judge did not specifically cite the nephew. However, I think there's a footnote that refers that he does confirm that. The nephew puts him in the mix. And I take it that the point of the banana leaves is that's how they marked themselves. That is. Many people testified to that. There was a banana grove adjacent to the soccer stadium or the soccer field, and that was how they decided to mark themselves so that a Hutu didn't accidentally kill another Hutu. Your point is there's sufficient evidence from which the decision could be made, and the other side can't meet the standard of forcing a compelled opposite determination. I'm not certain the other side can meet any standard, but the standard applicable. I'm not sure about that standard. I understand that. It had the standard they have to meet. Precisely. What the DHS investigators found was consistency in all of the stories. There's no fundamental inconsistencies, and certainly the immigration judge, in an abundance of caution, cut out the testimonies of I think there were 14 perpetrators. So that's really what I wanted to say. Unless the Court has any questions, we would rely on our brief, which I think does cover all the points. Okay. Thank you. Thank you, Your Honor. Let's hear the reply. I'm using fancy technology today. That's where I put the AR. I just want to correct a couple of things in response to or just in rebutting the government's argument. Number one, I did not say that Agent Hyman was impressed by the fancy car. That actually was a point to the nature of the investigation, that in fact my point about the car was that when Agent Hyman arrived in this small agrarian village in a large car with the Rwandan prosecutor, I feel that my point on cross-examination was that it was clear that this investigation was tainted, that the Rwandan government was involved. No one in the village would not know this. As to Mr. Bonamposi, I would note that in the transcript, in his testimony, he did say, in fact, that there were people at the central prisons who had spent 10 years, 15 years. This is at 194, 195, both groups of people. He said that they were tortured. He said that different people were tortured, including intellectuals like Mr. Munyakazi. So, I mean, again, just to clarify the record, this is part of that compelling evidence that tells us that torture is going to occur in Rwanda. With respect to the government's argument about their, or the government's best witnesses, I would note that the government says that Mr. A.M., Ms. A.M. told Agent Hyman that an unknown source had told her that Mr. M. was involved. She had no personal knowledge at all. In fact, the one thing that made her testimony interesting is that she confirmed the testimony of the petitioner and his wife in that her sister was in hiding at Mr. Munyakazi's house. Both the petitioner, both A.M. and his wife testified that this woman, Gertrude, had been in hiding at his house. And at the end of her testimony to Agent Hyman, she essentially says that when her sister left the house, two days later she was found by Hutus and killed. But not that Mr. Munyakazi had been involved in that. Mr. S.N. actually said she believed it. With the exception of that genocidaire, almost no one had personal knowledge. Ms. M. said that she saw him at a meeting, this meeting which took place where there was allegedly 2,000 people, but she wasn't at the meeting. So she couldn't have heard whatever the government had said. Ms. S.N. said that she believed he was involved, but she never saw him. She was told by another genocidaire that Mr. M. was involved. She was not available for cross-examination. In fact, none of these witnesses were available for cross-examination. Ms. E.M. is one that potentially could be. She was in the house. She was hiding in a room, so we can't be entirely sure about what she saw. And Mr. and Agent Hyman didn't ask her, or that evidence is not clear. So at the end of the day, what is clear is that the evidence of the government is speculative at best. And my burden is to show that my burden is preponderance of the evidence. And when you put our evidence, Mr. Munoz's, excuse me, evidence up against that, it does meet the standard, and it compels reversal both on the cat and the asylum. Thank you so much for your time today. Thank you. And I'll ask the clerk to adjourn court, and then we'll come down and greet counsel. This honorable court is adjourned. Signed, aye. God save the United States and this honorable court.
judges: William B. Traxler Jr., Dennis W. Shedd, Henry F. Floyd